UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                  :
JACOBS VEHICLE SYSTEMS, INC.,     :
ET AL.,                           :
                                  :
     Plaintiff and                :
     Counterclaim Defendants,     :
                                  :
V.                                :   CASE NO. 3:93-CV-1093 (RNC)
                                  :
                                  :
PACIFIC DIESEL BRAKE CO.,         :
ET AL.,                           :
                                  :
     Defendants and               :
     Counterclaim Plaintiffs.     :
```

RULING AND ORDER

In 1989, defendant Pacific Diesel Brake Co. was issued U.S.
Letter Patent No. 4,848,289 ("the '289 patent") for a method and
apparatus for retarding engines.  In 1993, plaintiff Jacobs
Vehicle Systems, Inc. ("Jacobs") sued Pacific Diesel Brake Co.
and its assignees (collectively "Pacbrake") for a declaratory
judgment of noninfringement and invalidity of the '289 patent.
Pacbrake filed a counterclaim asserting that Jacobs directly
infringed the '289 patent and supplied components to foreign
manufacturers who combined the components in a way that infringed
the '289 patent.  Pacbrake also joined as counterclaim defendants
Jacobs' parent companies, D.H. Holdings Corp. and Danaher Corp.
(collectively "Danaher").  Danaher has moved for summary judgment
on the ground that it is not liable for Jacobs' alleged

infringement.  For the reasons that follow, the motion is granted in part and denied in part.[1]

I.  Facts

Jacobs is wholly owned by D.H. Holdings Corp., which, in turn, is wholly owned by Danaher Corp.  (Danaher's L. Rule 56(a)1 Statement ¶¶ 1-5.)   The president of Jacobs reports monthly to a Danaher executive.  (Davies Dep. 17.)   Jacobs' president does not report to Jacobs' Board of Directors and does not know whether Jacobs has a board of its own.  (See Davies Dep. 18.)   Danaher participates in developing Jacobs' annual plans and goals.  (See Davies Dep. 17, 89.)   Danaher executives do not oversee the day-to-day operations of Jacobs.  (Davies Dep. 17, 89.)   Jacobs' relationship with Danaher gives it access to additional research and development funding.  (Pacbrake's Ex. 10, at 162.)

In September 1989, Mitsubishi, a Japanese manufacturer, contacted Jacobs about collaborating to produce engine brakes for a new Mitsubishi engine.  (Davies Dep. 93.)   Danaher was not involved in the early stages of the Mitsubishi project.  (Davies Dep. 17-18.)   In June 1990, the then-president of Jacobs wrote a letter to Mitusbishi indicating that Danaher fully supported Jacobs' commitment to and collaboration with Mitsubishi.

---

[1] Pacbrake has moved to strike the exhibits accompanying Danaher's reply brief or, alternatively, for leave to file a sur-reply.  The motion is denied as moot.  The exhibits in question did not bear on the court's resolution of the summary judgment motion.

(Pacbrake's Ex. 1, at 4.[2])  The letter also confirmed that
Danaher was committed to the project despite "the additional
financial task placed on Jake Brake/Danaher in a somewhat
difficult year in the U.S. industrial market."  (Pacbrake's Ex.
1, at 4.)  Jacobs started selling engine brakes to Mitsubishi in
1991.  (Jain Decl. 4.)  In a 1991 Annual Report, Danaher stated
in reference to Jacobs: "[W]e successfully developed a
partnership with Mitsubishi Motors Corporation . . . ."
(Pacbrake's Ex. 2, at 184.)  In 1993, the president of Jacobs and
the CEO of Danaher jointly visited Mitsubishi to thank it for its
business and to learn more about its manufacturing systems.
(Davies Dep. 92-93.)

     In 1990, Pacbrake learned that brakes sold by Jacobs to
Mitsubishi infringed the '289 patent.  (Danaher's Ex. 2, at 1-2.)
Pacbrake subsequently put the counterclaim defendants on notice
of the patent in 1991.  (Danaher's Ex. 2, at 2.)  Jacobs,
Danaher, and Pacbrake engaged in negotiations about Jacobs'
acquiring a license from Pacbrake and/or Danaher's purchasing
Pacbrake.  (Davies Dep. 23-25; Meneely Dep. 91-95.)  Jacobs did
not have the authority to purchase Pacbrake itself.  (Davies Dep.
24.)  After the negotiations failed, Pacbrake formally informed
Danaher in March 2003 that it had concerns about Mitsubishi

--------

     [2]  Although this exhibit was filed under seal, the relevant
portions of it were quoted and discussed in the parties' briefs
and thus are in the public record.

3

engines that incorporated a new engine brake manufactured by
Jacobs.  (Pacbrake's Ex. 4.)

This lawsuit followed.  Jacobs sued Pacbrake for a
declaratory judgment of noninfringement and invalidity.  Pacbrake
filed a counterclaim alleging infringement against Jacobs and
Danaher.  In 2002, the court denied the parties' motions for
summary judgment.  In October 2003, the court closed the case
without prejudice pending reexamination of the patent's validity
at the Patent and Trademark Office.  The Patent Examiner affirmed
the validity of the patent, and the parties reopened the case in
2005.  Danaher has moved for summary judgment on Counts II
through VI of the Counterclaim.

II.  <u>Discussion</u>

A.  <u>Summary Judgment Standard</u>

Summary judgment may be granted when "there is no genuine
issue as to any material fact" and "the moving party is entitled
to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
moving party has the burden of showing that no genuine issue of
material fact exists, and all reasonable inferences must be drawn
in favor of the nonmoving party.  <u>Sec. Ins. Co. of Hartford v.
Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004).
Once the moving party has demonstrated the absence of a genuine
issue of material fact, the nonmoving party must go beyond the
pleadings to identify specific material facts that are in

dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

B.  Analysis

The crux of Pacbrake's patent infringement allegations is that Jacobs (1) directly infringed the '289 patent by selling combination engine/exhaust brake retarders in the United States, including to Mack Trucks; and (2) infringed the '289 patent by selling engine brakes to foreign manufacturers, including Mitsubishi and Volvo, who combined the engine brakes with exhaust brakes in a way that infringed the patent.  For purposes of this motion, Jacobs and Danaher do not dispute these allegations.

A parent company is not automatically liable for its subsidiary's patent infringement.  See A. Stucki Co. v. Worthington Indus., Inc., 849 F.2d 593, 596-97 (Fed. Cir. 1988). A parent company will be held liable "only if the evidence reveals circumstances justifying disregard of the[ir] status . . . as distinct, separate corporations," or if the parent has itself engaged in conduct giving rise to liability under 35 U.S.C. § 271.  Id.  Pacbrake relies on both theories of liability: it contends that Danaher may be held liable as Jacobs' alter ego, and that Danaher has engaged in conduct prohibited by 35 U.S.C. § 271(b),(c) and (f).  These theories of liability are addressed below.

1.  Alter Ego Liability

In analyzing issues of alter ego liability, the Federal

Circuit follows the law of the other courts of appeals.
Insituform Techs., Inc. v. Cat Contracting, Inc., 385 F.3d 1360,
1380 (Fed. Cir. 2004).  The parties have not briefed in any
detail which law should govern the analysis here.  Danaher urges
the court to apply Delaware law because Danaher and Jacobs are
incorporated in Delaware, citing In re Cambridge Biotech Corp.,
186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999).  Pacbrake invokes the
law of New Mexico but does not explain why.  Generally speaking,
Connecticut law on the subject of a parent company's liability as
the alter ego of its subsidiary appears to be essentially the
same as the law of Delaware, and it does not appear to conflict
with any federal policy underlying the patent laws.  Accordingly,
Connecticut law will be applied.[3]

The Connecticut Supreme Court has articulated the
"instrumentality" and "identity" tests for veil-piercing.  The
instrumentality test requires a three-part showing:

> (1) Control, not mere majority or complete stock
> control, but complete domination, not only of finances
> but of policy and business practice in respect to the
> transaction attacked so that the corporate entity as to
> this transaction had at the time no separate mind, will
> or existence of its own; (2) that such control must
> have been used by the defendant to commit fraud or
> wrong, to perpetrate the violation of a statutory or
> other positive legal duty, or a dishonest or unjust act
> in contravention of plaintiff's legal rights; and (3)

---

[3]   See In re Gaston & Snow, 243 F.3d 599, 606 (2d Cir.
2001) (courts should abstain from creating federal common law
unless application of state common law would conflict with
federal policy).

6

that the aforesaid control and breach of duty must
[have] proximately cause[d] the injury or unjust loss
complained of.

Zaist v. Olson, 154 Conn. 563, 575 (1967).  Factors relevant to
the domination inquiry include whether corporate formalities were
observed, the subsidiary was inadequately capitalized, or the
parent used the subsidiary's funds for its own purposes, and the
extent of the subsidiary's business discretion.  See Litchfield
Asset Mgmt. Corp. v. Howell, 70 Conn. App. 133, 152-53 (2002).

Under the identity test, a parent may be liable for a
subsidiary's acts if

there was such a unity of interest and ownership that
the independence of the corporations had in effect
ceased or had never begun [and] an adherence to the
fiction of separate identity would serve only to defeat
justice and equity by permitting the economic entity to
escape liability arising out of an operation conducted
by one corporation for the benefit of the whole
enterprise.

Zaist, 154 Conn. at 576 (quoting Mull v. Colt Co., 31 F.R.D. 154,
163 (S.D.N.Y. 1962)).

The evidence in the summary judgment record, viewed most
favorably to Pabrake, is insufficient to support alter ego
liability under either of these tests.  The curious fact that the
president of Jacobs reported to Danaher's board without knowing
whether Jacobs had its own board certainly supports a logical
inference that Danaher's board controlled the overall direction
of the enterprise to an unusual degree.  But it is undisputed
that Danaher did not control Jacobs' day-to-day operations, and

7

the evidence is insufficient to support a reasonable inference
that Danaher so dominated Jacobs with regard to the transactions
at issue that Jacobs lacked a mind, will or existence of its own.
Moreover, Pacbrake does not contend that Jacobs is inadequately
capitalized, or that Danaher is hiding behind Jacobs' corporate
veil in order to perpetrate a fraud or other wrong.  In short,
this is not a case where preserving "the fiction of separate
identity would serve only to defeat justice."  <u>Zaist</u>, 154 Conn.
at 576.

    2.  <u>Liability under 35 U.S.C. § 271</u>

        a. <u>35 U.S.C. § 271(b)</u>

35 U.S.C. § 271(b) imposes liability on persons who
"actively induce[] infringement of a patent."  A parent company
may be liable for inducing its subsidiary to commit patent
infringement regardless of whether it is the subsidiary's alter
ego.  <u>See</u> <u>Insituform Techs., Inc.</u>, 385 F.3d at 1375.  An active
inducement claim requires a showing of (1) direct infringement
and (2) knowing inducement of infringement with the specific
intent to encourage infringement.  <u>MEMC Elec. Materials, Inc. v.
Mitsubishi Materials Silicon Corp.</u>, 420 F.3d 1369, 1378 (Fed.
Cir. 2005).[4]

---

    [4]   As the Federal Circuit has recognized, case law
governing the requisite level of intent lacks clarity.  <u>See</u> <u>MEMC
Elec. Materials, Inc.</u>, 420 F.3d at 1378 n.4.  Some cases require
a specific intent to cause infringement; others require only an
intent to cause the acts constituting infringement.  <u>See</u> <u>id.</u>

Pacbrake's active inducement claim fails for two reasons. First, Count IV, which appears to invoke a theory of inducement, does not allege a legally cognizable claim.  Count IV states that Danaher "aided and abetted Jacobs in the making, selling, or using of elements of engine retarders knowing same will be used in infringement of the '289 patent and that said elements have no other substantial non-infringing use."  I understand this count to imply that Danaher helped Jacobs commit contributory infringement in violation of 35 U.S.C. § 271(c), discussed below. However, Danaher can be liable for active inducement only if it induced direct infringement.  <u>See</u> <u>id.</u>  Because Count IV does not allege inducement of direct infringement, it fails as a matter of law.

Second, the evidence in the record is insufficient to sustain a claim of inducing direct infringement in any event. Pacbrake's allegations of direct infringement by Jacobs implicate its sales of combination engine/exhaust brake retarders within the United States, including to Mack Trucks.  Pacbrake has provided no direct evidence of Danaher's involvement in Jacobs' dealings with Mack Trucks or any other customer to whom Jacobs allegedly sold infringing products.  This leaves as support for the active inducement claim the general allegations that (1) Jacobs' president reported monthly to Danaher's board, (2)

(summarizing cases).  In this case, neither test is satisfied.

Danaher helped set annual goals, (3) Danaher's corporate literature used the word "we" to encompass Jacobs, (4) Jacobs had access to research and development funding from Danaher, (5) Danaher knew about the '289 patent, and (6) Danaher and Jacobs negotiated a licensing/purchase agreement with Pacbrake.  None of these facts suggests that Danaher took any affirmative action to induce Jacobs to make, use, sell, or offer to sell the '289 patent to Mack or other customers.  See Tegal Corp. v. Tokyo Electron Co., 248 F.3d 1376, 1378-79 (Fed. Cir. 2001) (requiring "an affirmative act of some kind").

> b. 35 U.S.C. § 271(c)

35 U.S.C. § 271(c) imposes contributory liability on persons who sell or offer to sell within the United States components of a patented invention that constitute a material part of that invention, knowing that the components are especially made or adapted for use in infringement of the patent.  See Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990).  Pacbrake has presented no evidence that Danaher sold or offered to sell within the United States any components of the '289 patent.  Accordingly, its reliance on this subsection of the statute is unavailing.

> c. 35 U.S.C. § 271(f)

35 U.S.C. § 271(f) provides:

> (1) Whoever without authority supplies or
> causes to be supplied in or from the United

10

States all or a substantial portion of the
components of a patented invention, where
such components are uncombined in whole or in
part, in such manner as to actively induce
the combination of such components outside of
the United States in a manner that would
infringe the patent if such combination
occurred within the United States, shall be
liable as an infringer.

(2) Whoever without authority supplies or
causes to be supplied in or from the United
States any component of a patented invention
that is especially made or especially adapted
for use in the invention and not a staple
article or commodity of commerce suitable for
substantial noninfringing use, where such
component is uncombined in whole or in part,
knowing that such component is so made or
adapted and intending that such component
will be combined outside of the United States
in a manner that would infringe the patent if
such combination occurred within the United
States, shall be liable as an infringer.

Section 271(f)(1) imposes liability on persons who supply

commodities with substantial noninfringing uses in a way that

actively induces an infringing combination abroad.  T.D.

Williamson, Inc. v. Laymon, 723 F. Supp. 587, 592 (N.D. Okla.

1989), aff'd, 923 F.2d 871 (Fed. Cir. 1990).  By contrast, under

271(f)(2), the component must be made for use in infringing the

patent and the supplier must intend for the infringing

combination to occur.  Id.  Liability under (f)(2) does not

depend on a showing that the combination actually takes place.

Waymark Corp. v. Porta Sys. Corp., 245 F.3d 1364, 1368 (Fed. Cir.

2001).  Both subsections hold liable not only the actual

suppliers of the components but also persons "who cause others to

supply components." <u>T.D. Williamson, Inc.</u>, 723 F. Supp. at 592.[5]

Pacbrake contends that Jacobs supplied engine brakes from the United States to Mitsubishi, actively inducing Mitsubishi to combine, or intending that Mitsubishi would combine, the engine brake with an exhaust brake in a way that would infringe the '289 patent.  Danaher did not itself "supply" the brakes; its liability turns on whether it "caused" Jacobs to supply the brakes.

While the evidence concerning Danaher's involvement in the Mitsubishi deal is far from overwhelming, I cannot say that it is insufficient as a matter of law.  Viewing the record in a manner most favorable to Pacbrake, a reasonable jury could find from Jacobs' 1990 letter to Mitsubishi that Danaher intended to provide financial support for the Mitsubishi project (or, at least, to withstand financial losses).  The evidence also shows that Danaher promoted the Mitsubishi deal in its own corporate literature and visited Mitsubishi in 1993 to thank it for its business.  From this evidence, a jury could conclude that Danaher's promotion of, and financial support for, the Mitsubishi deal encouraged Jacobs to develop engine brakes for Mitsubishi, thereby "causing" Jacobs to supply them.

---

[5]    The parties have not addressed whether the brakes supplied to Mitsubishi should be categorized under (f)(1) or (f)(2).  Because Danaher has not met its burden of showing the absence of an issue of fact in this regard, I will assume for purposes of this motion that both subsections apply.

12

For purposes of this motion, Danaher does not dispute that
Mitsubishi combined the Jacobs brake in a way that would infringe
the '289 patent had it occurred within the United States.  Thus,
a jury could find Danaher liable under § 271(f) if Danaher
actively induced the infringing combination by Mitsubishi (§
271(f)(1)) or intended for the component to be combined in an
infringing way (§ 271(f)(2)).  The record suggests that Danaher
had knowledge of the '289 patent as early as 1991.  Pacbrake
first developed concerns about the Mitsubishi partnership in
1992, at which point it was engaged in negotiations with Danaher
about a licensing/purchase agreement.  Danaher, by virtue of its
participation in these negotiations, presumably had knowledge of
Pacbrake's concerns about the Mitsubishi partnership.  A letter
from Pacbrake's counsel to Danaher in 1993 indicates that Danaher
was involved in previous communications between Pacbrake and
Jacobs concerning the '289 patent.  (Pacbrake's Ex. 4.)  Despite
knowledge of Pacbrake's concerns, Danaher continued to promote
the Mitsubishi deal publicly, further encouraging Jacobs to
supply the brakes.

The evidence supporting Danaher's intent to induce the
infringing combination is less substantial than in other cases
cited by the parties.  See, e.g., Donnelly Corp. v. Reiter &
Schefenacker GmBH & Co., 189 F. Supp. 2d 696, 708-09 (W.D. Mich.
2002) (finding active inducement under § 271(b) when the parent

13

guaranteed its subsidiary's contracts to produce the infringing product, sent samples and designs to its subsidiary, and provided technical support).  But intent is a matter best left to the jury.  See Insituform Techs., Inc., 385 F.3d at 1378.  Pacbrake's evidence is marginally adequate to give rise to an inference that Danaher intended or induced Mitsubishi's infringing combination. See, e.g., MEMC Elec. Materials, Inc., 420 F.3d at 1378 n.4 (intent to induce infringement presumed from intent to induce acts causing infringement and knowledge of the patent); Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1377-78 (Fed. Cir. 2005) (seeking a licensing arrangement with awareness of infringement contentions supports inference of intent to induce infringement).

Though Danaher Corp. is not entitled to summary judgment on this aspect of the case, Pacbrake has presented no evidence that D.H. Holdings in any way "caused" Jacobs to supply the brakes to Mitsubishi.  No other theory of liability has been shown to support a claim against D.H. Holdings.  Accordingly, it will be dismissed from the action.

I.    Conclusion

For the foregoing reasons, Danaher's motion for summary judgment [Doc. #252] is hereby granted in part and denied in part.  Counterclaims II through IV are dismissed, D.H. Holdings is dismissed as a party, and Pacbrake's motion to strike [Doc.

#259] is denied.

So ordered.

Dated at Hartford, Connecticut this 27th day of March 2006.


_____/s/_____
          Robert N. Chatigny
     United States District Judge